RECEIVED

JUL 2 5 2012

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

MICHAEL CASH, ET AL.                          CIVIL ACTION NO. 04-1648

VERSUS                                        JUDGE DOHERTY

UNOCAL CORPORATION, ET AL.                    MAGISTRATE JUDGE HILL

## RULING

On August 6, 2004, plaintiff Michael Cash filed the instant suit for injuries he sustained on August 11, 2003, while being transferred, via a crane, from a platform located on the outer continental shelf off the coast of Louisiana onto a service vessel. The case was originally assigned to Judge Tucker L. Melançon. Judge Melançon subsequently recused, and on March 9, 2009, the case was reassigned to this Court; thereafter certain aspects were resolved.

Following the initial filing of the suit, defendants commenced a vigorous battle over coverage, which ultimately resulted in this Court's severing the issues of liability and coverage for trial purposes. [Doc. 303] On May 11, 2010, upon joint motion of the parties, all claims in this matter were dismissed, with the exception of the following: (1) plaintiff's[1] claims against Max Welders ("but Max Welders, Inc. . . . shall be liable unto Michael Cash only to the extent of collectible insurance coverage provided by defendant, Liberty Insurance Underwriters, Inc." [Doc.

---

[1]The original plaintiffs in this suit were Michael Cash and his spouse, Penny Cash. On August 13, 2008, the claims of Penny Cash were dismissed with prejudice by the prior judge assigned to this matter, Judge Tucker Melançon. [Doc. 130] On September 5, 2010, Mr. Cash died in an automobile accident. The Estate of Michael Wayne Cash was substituted as party plaintiff for Michael Cash on April 4, 2011. [Doc. 388]

350, p.1][2]); and (2) Max Welders' cross-claim against Liberty Insurance Underwriters, Inc. ("Liberty"). [Doc. 350] On May 26, 2010, a telephone conference was held, at which counsel agreed to submit Max Welder's claim against Liberty for trial on the briefs.[3] [Doc. 354]  Trial briefs have now been submitted by Max Welders and Liberty.[4]  [Docs. 362, 364, 381] Having considered the record, the evidence and the memoranda of counsel, the Court finds in favor of Max Welders, for the reasons which follow.

## I.      Factual and Procedural Background

This case arises out of personal injuries sustained by plaintiff, Michael Cash, on August 11, 2003, while he was employed by Shaw Global Energy Services, Inc. ("Shaw Global") as a "laborer." [Doc. 32, p.2] Union Oil Company of California ("Unocal") retained Shaw Global to provide painting and sandblasting on its fixed platform, located within the Ship Shoal Block 209 field on the outer Continental Shelf, off the coast of Louisiana. Cash and the other Shaw Global workers were housed at an adjacent platform, and were transferred back and forth to the work platform via a vessel owned by Lytal Enterprises Inc. ("Lytal"), the M/V LYTAL ANDRE. Unocal retained Lytal to transport Unocal's contractors, including employees of Shaw Global, to Unocal's various platforms

---

[2]Although the "Order of Dismissal" submitted by the parties and signed by this Court [Doc. 350] purports to maintain plaintiff's claims against Glenn Ellerbee, in the course of drafting this Ruling, the Court discovered those claims were previously dismissed by Judge Melançon on December 29, 2004 . [Doc. 27]

[3]As discussed at a telephone conference held on May 26, 2010, if the Court were to find Liberty owes Max Welders coverage for this incident, the next issue to be addressed would, perhaps, be damages - namely, damages owed *by Max Welders* to plaintiff, recognizing plaintiff may recover "only to the extent of collectible insurance coverage provided by defendant, Liberty Insurance Underwriters, Inc." [Doc. 350, p.1]  If coverage is not owed, Liberty is to file a motion to dismiss. [*See* transcript of conference held May 26, 2010; *see also* Doc. 354]

[4]The day after Max Welders submitted its trial brief, plaintiff filed a trial brief adopting the brief of Max Welders.  However, it appears (although not abundantly clear) that plaintiff's direct claim against Liberty was previously dismissed. [*See* Docs. 322, 350]

located in the Gulf of Mexico.

Plaintiff alleges "[o]n or about August 11, 2003, while performing his employment duties . . ., [he] was injured as he was being transferred by crane from the Ship Shoal Block 209A platform to a vessel the "Lytal Andre", causing him severe and permanent disabling injuries and damages." [Doc. 1, ¶ VII]  At the time of the accident, the crane was being operated by Glenn Ellerbee, an employee of Max Welders, Inc. ("Max Welders").  Plaintiff alleges he was injured during the basket transfer due to the following negligent acts: the undertaking of a personnel basket transfer "in rough seas and poor weather" [Doc. 361, p.4]; the manner in which the "Captain and/or crew positioned, handled and/or operated the vessel before and/or during the operation which was ongoing at the time of the accident" [Id.; see also Doc. 210, p.6; Doc. 37, p. 3]; the crane operator (Glenn Ellerbee) "put[ting] his foot in the wrong place while operating the crane, causing the personnel basket carrying Complainant to descend too quickly," [Doc. 210, p.5] "which resulted in the personnel basket on which Mr. Cash was standing being slammed down onto a piece of equipment located on the deck of the 'LYTAL ANDRE', causing Mr. Cash to fall onto the deck of that vessel." [Doc. 105, p.2]

As noted, plaintiff settled his claims against all defendants, save Max Welders, and at this juncture, the Court must address Max Welders' cross-claim against Liberty. On June 12, 2009, Max Welders brought a cross-claim against Liberty[5], whereby it seeks a judgment against Liberty (who served as Max Welders' bumbershoot insurer), finding Liberty: (1) waived any right to contest coverage and/or raise exclusions under a bumbershoot policy it issued to Max Welders; (2) violated duties owed to Max Welders pursuant to La. R.S. 22:1892 and La. R.S. 22:1973; (3) "breached its

---

[5]Plaintiff had previously added Liberty as a defendant, via a Third Supplemental and Amending Complaint, filed on October 14, 2008. [Doc. 159]

agreement to provide insurance to Max Welders, Inc. and breached its duties in bad faith"; and (4) violated the Louisiana Unfair Trade Practices Act. [Doc. 248, p.9] By way of an amended cross-claim, Max Welders added a claim of detrimental reliance against Liberty, and additionally asked this Court to find no exclusions contained in the bumbershoot policy apply to this matter. [Doc. 251] The crux of the dispute centers around whether Liberty was legally entitled to deny coverage to Max Welders for this incident, pursuant to an argued exclusion contained in the bumbershoot policy, which states, "This insurance shall not apply to: . . . any liability or expense arising out of the ownership, use or operation of drilling rigs, drilling barges, drilling tenders, platforms, flow lines, gathering stations and/or pipe lines, but this exclusion shall not apply to craft serving the foregoing such as crew, supply, or utility boats, tenders, barges or tugs." [Doc. 362-2, pp. 16, 18] The Court must now determine whether or not the exclusion applies, and if the exclusion does apply, whether the bumbershoot policy issued by Liberty provides Max Welders with coverage for this occurrence.

At the time of plaintiff's accident, Max Welders carried comprehensive general liability insurance ("CGL"), automobile insurance, employers' liability insurance ("EL"), maritime employers' liability insurance ("MEL"), and protection and indemnity insurance ("P&I"). [Doc. 362-2, p.4] Additionally, Max Welders carried a marine excess liability ("Bumbershoot") policy, issued by Liberty.[6] [Doc. 362-2]

---

[6]"A 'bumbershoot' is '[a] marine insurance policy covering multiple liability coverages in excess of one or more different underlying policies (comparable to the Commercial Liability Umbrella covering liabilities on land). 'Bumbershoot' is the English word for 'Umbrella'; i.e., 'all encompassing.'" *St. Paul Travelers Companies, Inc. v. Corn Island Shipyard, Inc.*, 495 F.3d 376, 379 n.1 (7th Cir. 2007) (quoting *Glossary of Marine Insurance and Shipping Terms*, 14 U.S.F. Mar. L.J. 308, 325).

As described by one scholar:

The "bumbershoot" policy is a marine "umbrella cover," which provides general liability coverage of a marine nature. The bumbershoot policy is excess of the underlying insurance policies scheduled on the policy, and depending on the policy's language, the

In June of 2007, Max Welders submitted notice to Liberty that plaintiff's claim may exceed the limits of its primary liability insurance policy. [Docs. 362, p.7; 381, p. 24]  On February 10, 2009, Liberty advised Max Welders it was declining coverage for plaintiff's injuries, **on the basis of exclusion III.A.11.(d) ("the platform exclusion") contained in the bumbershoot policy. [Doc. 362-10]**

The policy issued by Liberty to Max Welders provides coverage for the following:

A.      Coverage

The Policy shall indemnify the Insured with respect to the operations listed in Item 7 of the Declarations[7] for the following . . .

---

scope of the bumbershoot policy can be extended to cover the assured's liability not already insured elsewhere in the underlying insurance policies. The bumbershoot policy generally provides two types of coverage: (1) standard following form excess coverage, providing a second layer of excess liability insurance and (2) broader coverage than that provided by the underlying insurance policies.  The purpose of the bumbershoot policy is to cover any unforeseeable loss not covered by the assured's other underlying insurances; the bumbershoot policy responds to the loss if the loss is not otherwise covered by the underlying insurance.

As to those losses covered by the underlying insurance policies, including even an excess liability policy, the bumbershoot policy serves as a second layer of excess insurance and responds only after the policy limits of those underlying policies are exhausted.  However, as to losses not covered by the underlying insurance policies, the bumbershoot policy serves to fill the gaps left uninsured by the underlying insurance layers and responds as the initial or primary policy for those otherwise uninsured losses.

The standard bumbershoot policy provides the assured coverage beyond that contained in the assured's underlying insurance policies: (1) protection and indemnity risks "of whatsoever nature whether or not covered by the underlying" P&I insurance; (2) general average, collision liabilities, salvage, salvage charges, and sue and labor "arising from any cause whatsoever"; and (3) "all other legal and contractual liabilities of whatsoever nature" for personal injury, death, or property damage (whether by vessel or otherwise).

Robert T. Lemon II, *Allocation of Marine Risks: An Overview of the Marine Insurance Package*, 81 Tul. L. Rev. 1467, 1489-90 (2007)(footnoted citations omitted).

[7]Item 7 of the Declarations reads, "Description of Insured Operations: *Oilfield Offshore Contractor*" [Doc. 362-2, p.3 (emphasis in original)]

-5-

1 All Protection and Indemnity risks covered by the underlying Protection and Indemnity Insurance . . . .

2 General average, marine collision liabilities, salvage, salvage charges and related sue and labor arising from any cause whatsoever.

3 All other sums which the Insured shall become legally liable to pay as damages on account of:

 a personal injuries, including death at any time resulting therefrom, or

 b property damage

caused by or arising out of each occurrence happening anywhere in the world.

[Doc. 362-2, p.13] The exclusion at issue (*i.e.* the "platform exclusion") provides as follows:

A. This insurance does not apply to:

 . . . .

11 Any liability for, or any loss, damage, injury or expense caused by, resulting from or incurred by reason of:

 . . . .

d any liability or expense arising out of the ownership, use or operation of drilling rigs, drilling barges, drilling tenders, platforms, flow lines, gathering stations and/or pipe lines, but this exclusion shall not apply to craft serving the foregoing such as crew, supply, or utility boats, tenders, barges or tugs

[Doc. 362-2, pp.16, 18]  None of the pertinent terms are defined in the policy.  As interpreted by Liberty in the "Notice of Declination of Coverage" it sent to Max Welders, the bumbershoot does not provide coverage for this incident:

Thus, as you can see, **under Section III.A 11.d. of the aforementioned exclusion [*i.e.* the platform exclusion],** there is no coverage under the policy for bodily injury directly or indirectly arising out of the ownership, use or operation of platforms.  Accordingly, since the plaintiff's complaints clearly alleges [sic], and

since the scope of the work which Max Welders was contracted to perform pursuant to a master service agreement with Chevron involved, the use or operation of a platform and, since the liability of Max Welders, Inc. arises out of the operation of that platform, there is no coverage for this claim.

[Doc. 362-10, p.3 (emphasis added)]

## II.     Applicable Law

Both parties assert Louisiana state law is the body of law applicable to this matter.[8]  However, the Court notes "[i]t is well settled that a marine insurance policy is a maritime contract." *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 886 (5th Cir. 1991); *see also St. Paul Fire & Marine Ins. Co. v. Board of Com'rs of Port of New Orleans*, 418 Fed.Appx. 305, *2 (5th Cir. 2011)("bumbershoot policies are widely recognized as common marine insurance policies").  Therefore, state law will govern, *in the absence of a specific and controlling federal rule. Albany* at 886.  The Fifth Circuit has identified three factors a court should consider in determining if a federal maritime rule controls the disputed issue: (1) whether the federal maritime rule constitutes "entrenched federal precedent"; (2) whether the state has a substantial and legitimate interest in the application of its law; and (3) whether the state's rule is materially different from the federal maritime rule. These factors are merely instructive and not dispositive. *Albany* at 886-87.  This Court has not located, nor has any party cited any specific and controlling federal rule pertinent to this matter, or argument suggesting Louisiana law should not govern under this factual and legal scenario.  Accordingly, the Court will review the insurance policy in accordance with the substantive law of Louisiana.

---

[8]According to Max Welders, "The parties appear to agree that Louisiana law controls interpretation of the policy." [Doc. 362, p.8] According to Liberty, because "[p]laintiff's incident involved a fixed platform, off the Louisiana coast, located on the Outer Continental Shelf," Louisiana law applies to the extent that state law is not inconsistent with federal law." [Doc. 381, p.10] The Court notes Liberty's position is stated too broadly, as it is arguing the law applicable to the underlying *tort*. At this juncture, the Court must apply the law applicable to the *contract* of insurance, an inquiry somewhat less clear than Liberty asserts.

"An insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code." *Cadwallader v. Allstate Ins. Co.*, 848 So.2d 577, 580 (La. 2003); *see also Fontenot v. Diamond B Marine Services, Inc.*, 937 So.2d 425, 428 (La. App. 4 Cir. 2006). "The judiciary's role in interpreting insurance contracts is to ascertain the common intent of the parties to the contract." *Cadwallader* at 580; La. Civ. Code art. 2045. "The parties' intent, as reflected by the words of the policy, determine [sic] the extent of coverage." *Reynolds v. Select Properties, Ltd.*, 634 So.2d 1180, 1183 (La. 2007).

As recognized by the Louisiana Supreme Court:

> The purpose of liability insurance is to afford the insured protection from damage claims. Policies therefore should be construed to effect, and not to deny, coverage. Thus, a provision which seeks to narrow the insurer's obligation is strictly construed against the insurer, and, if the language of the exclusion is subject to two or more reasonable interpretations, the interpretation which favors coverage must be applied.

> It is equally well settled, however, that subject to the . . . rules of interpretation, insurance companies have the right to limit coverage in any manner they desire, so long as the limitations do not conflict with statutory provisions or public policy.

*Elliott v. Continental Cas. Co.*, 949 So.2d 1247, 1254 (La. 2007)(quoting *Reynolds v. Select Properties, Ltd.*, 634 So.2d 1180, 1182-83 (La. 1994))(emphasis omitted).

The words of the insurance contract are not to be read in isolation, as "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to or made a part of the policy." La.Rev.Stat. Ann. § 22:881. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ.Code Ann. arts. 2046. "The words of a contract must be given

-8-

their generally prevailing meaning.  Words of art and technical terms must be given their technical meaning when the contract involves a technical matter." La. Civ. Code art. 2047; *see also Doerr v. Mobil Oil Corp.*, 774 So.2d 119, 124 (La. 2000) ("In analyzing a[n insurance] policy provision, the words, often being terms of art, must be given their technical meaning."); *Matter of Hill*, 981 F.2d 1474, 1485 (5th Cir. 1993)("'Words of art and technical terms' in art. 2047 refers to technical terms of art from . . . disciplines, such as . . . the oil and gas industry. . . .")(citing *McCoy v. United Gas Public Serv. Co.*, 57 F.Supp. 444, 445 (W.D.La.1944) (holding phrase in mineral lease to be construed according to meaning of terms commonly understood in oil and gas industry)).  "Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract." La. Civ. Code art. 2048.  "A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." La. Civ. Code art. 2049.

Where "the written expression of the common intention of the parties is ambiguous," parol or extrinsic evidence is admissible to interpret the parties' intent.  *Campbell v. Melton*, 817 So.2d 69, 75 (La. 2002); *Greenwood 950, L.L.C. v. Chesapeake Louisiana, L.P.*, — F.3d —, 2012 WL 2105895, *2 (5th Cir. 2012).[9]  "The determination of whether a contract is clear or ambiguous is a

---

[9]As explained by one prominent Louisiana scholar:

> When words of art and technical terms are used in a contract that involves a technical matter, those words and terms must be given their technical meanings. [La. Civ. Code. art 2047] There should be little doubt that extrinsic evidence, such as testimonial proof, is many times the only way in which the court may be informed of the technical meaning of words of art and technical terms, which sufficiently explains that such evidence is admissible for that purpose. Thus, if a contract of lease states that the lessee will use the premises only for the practice of general dentistry, the testimony of expert dentists is admissible to explain whether the practice of orthodontics is included in the general practice of dentistry. Likewise, the testimony of expert engineers is admissible to explain whether the term per running foot found in a street-paving contract means per running foot of property front or per running foot of street.

question of law." *Sims* at 590.  "A contract is considered ambiguous on the issue of intent when either it lacks a provision bearing on that issue, the terms of a written contract are susceptible to more than one interpretation, there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed." *Campbell* at 75 (citing La. Civ.Code art. 1848); *see also Greenwood* at *2.  As stated by the Louisiana Supreme Court:

> "Ambiguity will also be resolved by ascertaining how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered." *Breland v. Schilling*, 550 So.2d 609, 610-11 (La.1989). The court should construe the policy "to fulfill the reasonable expectations of the parties in the light of the customs and usages of the industry." *Trinity Industries*, 916 F.2d at 269 (5th Cir.1990) (citing *Benton*, 379 So.2d at 231 and LSA-C.C. Arts. 2045, 2050, 2053 and 2054). In insurance parlance, this is labelled [sic] the reasonable expectations doctrine. *Richards*, *supra* at § 11:2[g].FN9
>
> > FN9. The reasonable expectations doctrine can be capsulized as follows: "courts will protect the [insured's] reasonable expectations ... regarding the coverage afforded by insurance contracts even though a careful examination of the policy provisions indicates that such expectations are contrary to the expressed intention of the insurer." R. Keeton and A. Widiss, *Insurance Law* § 6.13 (1988).

*Louisiana Ins. Guar. Ass'n* at 764; *see also Six Flags* at 955 ("[I]n cases of ambiguity, [t]he court should construe the policy to fulfill the reasonable expectations of the parties in the light of the customs and usages of the industry") (internal quotation marks omitted).  Finally, "[a] doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the

---

5 Saul Litvinof, <u>Louisiana Civil Law Treatise, The Law of Obligations</u> § 12.101 (2d ed. 2011)(footnotes omitted); *see also Barber Ashpalt Pav. Co. v. Howcott*, 33 So. 734 (La. 1903)(allowing parol evidence to determine the meaning of "running foot," which in "paving parlance . . . has a technical meaning. . . ."); *Baron v. Placide*, 7 La.Ann. 229 (La. 1852)("It is proved by unimpeached evidence, that the printed part of the contract is a clause of style applicable to actors and singers, and not to dancers. . . . The printed clause when applied to a dancing girl, if not absurd, is at least ambiguous, and as whatever is ambiguous in contracts should be determined according to the usage of the country where they are made. . . . The printed clause may well be said to be technical, and this evidence was necessary to enable the court to interpret according to its received meaning, with those who profess the art to which it applies.")

parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." La. Civ. Code art. 2053.[10]

"If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the drafter, or, as originating in the insurance context, in favor of the insured." *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So.2d 759, 764 (La. 1994); *Campbell* at 75 ("Contract interpretation of ambiguous terms requires construction against the contract's drafter")(citing La. Civ. Code art. 2056); *Greenwood* at *2 ("If the contract remains ambiguous, and if there are two or more reasonable interpretations, the contract is construed against its drafter"). The United States Court of Appeals for the Fifth Circuit interprets Louisiana law as making the foregoing presumption inapplicable "where the insured is a sophisticated commercial entity that itself drafts or utilizes its agent to secure desired policy provisions." *Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 958 (5th Cir. 2009); *but cf. Lake Charles Harbor & Terminal Dist. v. Imperial Cas. & Indem. Co.*, 857 F.2d 286, 288 (5th Cir. 1988)(refusing to alter the presumption where the insurance broker chose the terms but received no compensation from the insured and where there was no evidence of the insured's superior bargaining power).

"When determining whether or not a policy affords coverage for an incident, it is the burden of the insured to prove the incident falls within the policy's terms." *Doerr* at 124. However, "on the other hand, the insurer bears the burden of proving the applicability of an exclusionary clause within the policy." *Id.*; *see also Martco Ltd. v. Wellons, Inc.*, 588 F.3d 864, 880 (5th Cir. 2009). If

---

[10]As set forth in the Louisiana Civil Code, *equity* "is based on the principles that no one is allowed to take unfair advantage of another and . . . no one is allowed to enrich himself unjustly at the expense of another"; *usage* "is a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation." La. Civ. Code art. 2055.

the insurer "cannot unambiguously show an exclusion applies, the Policy must be construed in favor of coverage." *Martco Ltd. Partnership v. Wellons, Inc.*, 588 F.3d 864, 880 (5th Cir. 2009). Accordingly, it is Max Welders' burden to establish the incident falls within the policy terms, and it is Liberty's burden to prove the platform exclusion prohibits coverage in this matter.

### III.    Analysis

Looking to the language of the policy at issue, on its face the policy sets out to provide certain excess insurance coverage to Max Welders, with respect to the performance of its work as an "oilfield *offshore contractor*," for various marine risks (*i.e.* P&I risks, general average, marine collision, salvage, salvage charges, related sue and labor), as well as "*all other sums which the Insured shall become legally liable to pay as damages on account of: . . . personal injuries. . . caused by or arising out of each occurrence happening anywhere in the world.*"[11] However, the policy also contains an exclusion for "any liability . . . arising out of the ownership, use or operation of . . . platforms," however, the policy, also, qualifies that exclusion by providing the exclusion "shall not apply to craft serving the foregoing such as . . . tenders . . . ." [Doc. 362-3, p.8] Accordingly, it appears the contract, on its face, would provide coverage to Max Welders and any exclusion would be qualified, at least as to "any liability arising out of" the use of a "craft" (such as a drilling tender), which is "serving" a platform.

Max Welders argues, "'Oilfield Offshore Contractor' is a term of art is [sic] known throughout the Bumbershoot insurance market as a service contractor who provides services to energy companies that own and/or operate platforms." [Doc. 362, pp. 10-11] Max Welders further argues the platform exclusion has acquired a "technical meaning" in the bumbershoot market and

---

[11]*See* Doc. 362-3, pp. 2, 3 (emphasis added)

"applies to an entity that 'owns' or 'operates' a platform such as 'energy' companies, or companies

that either own the 'energy producing equipment' or contract the process of operating that equipment

to an 'operator.'" [Doc. 362, p.12] "Stated another way, the Platform Exclusion is interpreted by the

industry [*i.e.* "the insurance market, particularly the Bumbershoot insurance market"[12]] to apply to

companies with 'down-hole' exposure." [Id.] In contrast, Liberty asserts, "The Platform Exclusion

in Liberty's Policy unambiguously excludes coverage for liability arising out of the ownership, use

or operation of platforms." [Doc. 381, p.9] Liberty, applying the broadest possible reading and

definition of the term "use," argues because the occurrence "arose out of the use of the Unocal

platform crane by Max Welders, Inc.," coverage is excluded [Id. at 15].  Neither party addresses the

second half of the exclusion's language, which provides, "but this exclusion shall not apply to craft

serving the foregoing [platforms] . . . ," [Doc. 362-2, p. 18] which, factually, likely would not apply,

but which certainly establishes some limitation on the argued exclusion and reading and definition

of "use."

The allegations before the Court indicate *both* a crane located on a platform, *and* a drilling

tender serving that platform, are alleged to have been involved in the incident leading to plaintiff's

injuries, and the negligent acts alleged implicate both.[13]  Nevertheless, Liberty takes the position it

does not owe Max Welders indemnification for any "personal injuries . . . caused by or arising out

---

[12]Doc. 362, p.11

[13]Again, plaintiff alleged he was injured during the basket transfer due to the following negligent acts: the undertaking of a personnel basket transfer "in rough seas and poor weather" [Doc. 361, p.4]; the manner in which the "Captain and/or crew positioned, handled and/or operated the vessel before and/or during the operation which was ongoing at the time of the accident" [Id.; *see also* Doc. 210, p.6; Doc. 37, p. 3]; the crane operator (Glenn Ellerbee) "put[ting] his foot in the wrong place while operating the crane, causing the personnel basket carrying Complainant to descend too quickly," [Doc. 210, p.5] "which resulted in the personnel basket on which Mr. Cash was standing being slammed down onto a piece of equipment located on the deck of the 'LYTAL ANDRE', causing Mr. Cash to fall onto the deck of that vessel." [Doc. 105, p.2]

of" a personnel basket transfer from a platform to a drilling tender, even when the injury is incurred on the tender, arguing with scant, if any, factual or legal support:

> There is no dispute that Max Welders' alleged liability for Plaintiff's incident arose out of the use of the Unocal platform crane by Max Welders, Inc. . . . A crane affixed to the platform is its component part and is hence an immovable. . . . The liability . . . arose out of the use or operation of a platform.

[Doc. 381, p.15]

As noted, it is Liberty's burden to prove the exclusion governs in this matter.  However, Liberty has provided no basis for its position that this particular crane constitutes[d] a component part of the platform, nor for how the facts and multiple legal claims made by plaintiff support its argument.  Rather, Liberty merely makes the unsupported conclusory allegation that *this* crane, factually, actually was a "component part" of *this* platform and, therefore, based upon that conclusory statement, the exclusion should apply.  The pertinent Civil Code article addressing "component parts" and eluded to by Liberty to support its assertion, provides in pertinent part as follows:

> Things that are attached to a building[14] and that, according to prevailing usages, serve to complete a building of the same general type, without regard to its specific use, are its component parts. Component parts of this kind may include doors, shutters, gutters, and cabinetry, as well as plumbing, heating, cooling, electrical, and similar systems.
>
>             . . . .
>
> Other things are component parts of a building or other construction if they are attached to such a degree that they cannot be removed without substantial damage

---

[14]A drilling platform is deemed an immovable, more specifically, a "building," pursuant to Louisiana jurisprudence interpreting the Louisiana Civil Code.  *Olsen v. Shell Oil Co.*, 365 So.2d 1285, 1290 (La. 1978)(on certified question from the United States Court of Appeals for the Fifth Circuit); *see also Perry v. Chevron U.S.A., Inc.*, 887 F.2d 624, 626 (5th Cir. 1989); *Bruyninckx v. Bratten*, 554 So.2d 247, 248-49 (La. 3rd Cir. 1989); 2 A.N. Yiannopoulos, *Louisianan Civil Law Treatise, Property* § 137 (4th ed. 2011).

to themselves or to the building or other construction.

La. Civ. Code art. 466.[15]

First, it should be noted Liberty makes its argument upon this *factual* determination and thus, application of this particular La. Civil Code article. Although, as a matter of practice, cranes which can lift the large loads involved in drilling and production operations are usually fully attached to

---

[15]The Revision Comments to the 2008 article provide the following guidance:

> (f) In the application of the first paragraph of the Article, the specific use of a building is not to be considered, nor is any specific industrial or commercial activity that may happen to be conducted within the building. *See Day v. Goff*, 2 La. App. 75 (2d Cir. 1925). *Cf. Showboat Star Partnership v. Slaughter*, 789 So.2d 554 (La. 2001), which, in applying Civil Code Article 466 (1978) by analogy, found the relevant inquiry to encompass vessels in general rather than riverboats operated for gaming purposes. Similarly, in applying the same Article to a building used as a hospital, *Willis-Knighton Medical Center v. Caddo-Shreveport Sales & Use Tax Commission*, 862 So.2d 358 (La. App. 2 Cir. 2003) focused on commercial buildings in general, rather than hospitals. A lighting fixture that illuminates the interior of a commercial building, such as a hospital, serves to complete the building in its quality as a commercial building and is therefore its component part. By contrast, a nuclear camera located in a building used as a hospital, as in the *Willis Knighton* cases, cannot be a component part of the building under the first paragraph of this Article, because the camera does not serve to complete the building itself, though it might be useful in the operation of a hospital within the building. The nuclear camera would nonetheless constitute a component part of the building under the third paragraph of the Article if it could not be removed without substantial damage to either itself or the building.
>
>                 . . . .
>
> (h) The first two paragraphs of this Article require a modicum of physical attachment, though the attachment need not approach the degree necessary to satisfy the substantial damage test of the third paragraph. Attachment consisting solely of the insertion of an electrical plug into an outlet is too ephemeral and insubstantial to satisfy the requirements of this Article. *See Equibank, supra*. Mere placement of movables upon an immovable for its service and improvement, without physical attachment, is insufficient to cause them to become component parts of the immovable under this Article. . . .

Although the version of La. Civ. Code art. 466 cited above was not enacted until 2008 (whereas the contract of insurance went into effect, and plaintiff's accident occurred in 2003), under these facts, the current version of article 466 is to be applied retroactively. *See e.g. U.S. E.P.A. v. New Orleans Public Service, Inc.*, 826 F.2d 361, 365 (5th Cir. 1987).

the platform and thus, component parts of that platform, that is not always the case.  Often cranes are moved from platform to platform depending on the nature of the crane, nature of the platform and task at hand.  Here Liberty, which bears the burden of proof on this point, has failed to address this threshold factual issue and thus, has failed to establish *this* crane on *this* platform is/was actually a component part of *this* platform and thus, has failed to establish the possible application of the La. Civil Code article eluded to by way of their argument.  The Court notes Liberty has not shown that this crane was "attached" in any manner, whatsoever, to the platform, whether permanently or temporarily, nor has it argued the crane could or could not be removed "without substantial damage" to the platform as contemplated by the civil code.

In *Coulter v. Texaco*, 117 F.3d 909, 916-918 (5th Cir. 1997), the Fifth Circuit held a drilling rig - which was welded to a drilling platform and required modification to both the rig and the platform in connection with the rig's installation - was not a component part of the platform.  The Court reasoned that although the repairs which would be required to return the rig and platform to their original conditions "may well be 'substantial' on an absolute basis, they are certainly negligible relative to these two multi-million dollar structures." *Id.* at 917.  The Court further found plaintiffs had presented no evidence that the removal of the rig would cause the rig or the platform "to sustain any enduring 'damage' in the sense that either will thereafter become functionally impaired on a permanent basis." *Id.*  Finally, the Appellate Court found "the average, ordinary, and prudent business entity that was buying or, alternatively, taking a security interest in, an offshore drilling platform" would not expect the rig to be a permanent attachment to the platform. *Coulter* at 918; *see also Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558 (5th Cir. 2003).  While the usual presumption might be that a production platform would have a crane, as opposed to a drilling rig,

as a permanent attachment, again, that is not always the case, and begs the question that if Liberty wishes to rely upon an exclusion to deny coverage, it is clear they bear the burden to establish the applicability of the argued exclusion; and Liberty has failed to carry its burden to establish the underlying factual basis Liberty put at the foundation of that argument.

In light of the foregoing, and in the absence of any evidence the crane actually formed a component part of Unocal's platform, Liberty's argument fails of its own weight - Liberty's conclusory argument that because "a crane affixed to [a] platform is its component part and is hence an immovable," liability in this matter necessarily "arose out of the use or operation of a platform" must fail. [Doc. 381, p.15] Further, as noted earlier, this cursory and conclusionary argument, also, ignores the additional limiting language of the exclusion. Whether negligence of a vessel for which Max Welders had, it would seem, no responsibility legally or factually, would change the analysis when looking to language of an exclusion and not to possible tort liability, is a matter upon which this Court offers no opinion whatsoever. However, again, Liberty's reading of the exclusion to the exclusion of a clear limitation, when arguing the broadest possible reading of that exclusion is, perhaps, problematic.

Additionally, the Court finds after full review of the facts and evidence presented within these trial briefs, the platform exclusion is inapplicable to the facts of this matter, for the reasons that follow. As previously noted, none of the terms within the policy pertinent to this litigation are defined in the policy. Nevertheless, on its face, a stated purpose of the policy is to indemnify Max Welders for personal injuries arising out of its operations as an "Oilfield Offshore Contractor."[16]

---

[16]In its 2002 application to Liberty, Max Welders provided an overview of its services, which states in part: "**Offshore work currently consists of a long-term contract with Unocal to service and maintain a platform.**" [Doc. 362-4 (emphasis added)] In that document, Max Welders refers to Unocal as its "main customer." [Id.] While it does not appear that the same overview was submitted to Liberty in

[Doc. 362-2, pp. 3, 13] However, as noted, Liberty argues the policy excludes coverage for any liability "arising out of the . . . use . . . of . . . platforms," however, Liberty fails to note the exclusion does not apply to craft *serving the platform* - thus, the exclusion, on its face, clearly contemplates a reading, at least in this particular matter, narrower in scope than the argument made by Liberty. Thus, there appears to be a conflict between the declared broad coverage "anywhere in the world," and that which was negotiated and paid for by Max Welders when one looks at Max Welders primary work and business, and the exclusion Liberty argues excludes the same hazard. *See e.g. Gottsegen v. Hart Property Management Inc.*, 820 So.2d 1138, 1142 (La. App. 5 Cir. 2002)(Where insurance policy contained a conflict between the declared coverage and an exclusion and was therefore deemed ambiguous, the policy was construed to provide coverage). "[A] contract is ambiguous when, *inter alia*, its 'written terms are susceptible to more than one interpretation,' when 'there is uncertainty as to its provisions,' or when 'the parties intent cannot be ascertained from the language used.'" *Greenwood* at *2; *see also Campbell* at 75. Here, the words of the contract are susceptible to more than one interpretation (depending on how broadly one defines the term "use" and the entirety of the exclusion when read in its entirety), and uncertainty as to how broadly one should read the platform exclusion when read within context of the entire policy and its declared purpose. Accordingly, the Court finds the insurance policy to be ambiguous, and thus, extrinsic evidence is permissible to determine the parties' intent.

Max Welders submits the deposition testimony of several witnesses to support its interpretation and intent of the parties. First, Max Welders submits the deposition testimony of

---

connection with Max Welders 2003 renewal application to Liberty [Doc. 362-5], Max Welders asserts "the renewal application incorporated the original application." [Doc. 362, p.6] The Court has been unable to locate the provision of the 2003 renewal application, incorporating the original application.

Joseph C. Morency, a former underwriter with Liberty, in support of its argument that the terms

"offshore oilfield contractor" and "platform exclusion" are terms of art and/or technical terms within

the Bumbershoot insurance market. Mr. Morency testified he has been in the insurance underwriting

business since 1989, with the focus of his career being in excess marine liability (a.k.a. bumbershoot

insurance). [Doc. 362-7, p. 3]

Mr. Morency first underwrote a bumbershoot policy for Max Welders in 1997, while he was

working for Reliance National. [Id., pp. 3, 4] Mr. Morency began working for Liberty in November

of 1999, and stayed with Liberty until September of 2003. He was hired by Liberty to develop its

excess, blue water, and offshore energy books of business. [Id., p. 8] He originally underwrote

marine excess, blue water hull and offshore energy policies. He was later promoted to chief

underwriting officer for all of marine, which included cargo and primary hull, in addition to marine

excess, blue water hull and offshore energy. [Id. at 4, 8] Mr. Morency was the lead underwriter at

Liberty when the 2002 and 2003 bumbershoot policies were issued to Max Welders. [Id., p. 11]

Mr. Morency testified while he was at Reliance, he helped to create the basic form used in

writing a Bumbershoot policy. He testified that same form is still used today, he has seen no changes

to the form during his career[17], and the form has been adopted by other carriers. [Id. at 4] He further

testified when he left Reliance and went to Liberty, he continued to use the same Bumbershoot form

he had developed at Reliance. [Id., pp. 3,4]

Mr. Morency testified in 1997, when he first underwrote Max Welders' bumbershoot policy

while he was with Reliance, he had to learn about Max Welders business during the application

---

[17]In fact, the wording of the platform exclusion contained in the bumbershoot underwritten by
Reliance on behalf of Max Welders is identical to that which is contained in the Liberty policy. [Doc.
362-7, p.5]

process in order to underwrite the policy.  [Id., pp. 4-5] Mr. Morency testified Max Welders was an "oilfield service contractor," which did general maintenance work, light welding, etc.   Mr. Morency's understanding is that an oilfield service contractor is an entity that works offshore, providing a service to a third party's platform or other type of offshore structure or equipment, which could include crane operations. [Id., pp. 5, 7]  He further testified in his experience the term "oilfield service contractor" is well understood throughout the bumbershoot marine excess market.

Mr. Morency testified, in his opinion, in light of the type of work in which Max Welders engaged, the bumbershoot policy was designed to provide coverage for any loss Max Welders had while working aboard a third party's platform. [Id., p. 5]  Mr. Morency testified the exclusion for "any liability or expenses arising out of the ownership, use or operation of drilling rigs, drilling barges, drilling tenders, platforms, flow lines, gathering stations and/or pipe lines" (*i.e.* the platform exclusion) would not apply to Max Welders' platform work, because Max Welders did not "own or operate drill rigs, drill barges, drill tenders, platforms, flow lines."  [Id., p. 6]  He testified the exclusion applied to owners and operators of drilling platforms, etc. - *i.e.* owners and operators of "an energy producing piece of equipment" - because a marine liability underwriter would not wish to cover liability associated with an energy company in a bumbershoot. [Id., p. 6]  He further explained:

> A.  Well, the energy exposure presents a whole other host of exposures that a marine liability underwriter doesn't want to pick up and doesn't price his product to pick up.
>
> So it would be control, a - well, it could be down-hole liability or it could be - it could be just a whole host of energy-related exposures that as a nonoperator, whether you own it or operate it, that's where that exposure lies.  And that particular owner or operator would buy a policy to protect their interest for that.
>
> . . . .

So those package polices are written in the energy market by energy underwriters.   Whether it's offshore energy underwriters or onshore energy underwriters.

Q. So when you read this exclusion that we're talking about, what comes to your mind is the energy market and the companies that either own or physically are operating these energy pieces of equipment?

A. Correct

[Id., p. 6] Mr. Morency testified bumbershoot policies are not intended to underwrite energy exposures. [Id., p. 8]  Mr. Morency testified that when he went through the application process with Max Welders, he determined Max Welders did not have any energy exposure; had Max Welders had any energy exposure, he would not have issued the Bumbershoot policy. [Id., p. 8]

In connection with developing Liberty's bumbershoot program, Mr. Morency testified his department solicited "marine businesses and accounts that generally were in the business of either marine transportation, servicing of marine vessels and/or servicing on the marine contracting side," which would include offshore oilfield contractors, bulkeading contractors, "and just about everything in between that we would define as coastal marine contractors." [Id., p. 9]  The type of coverage he offered such companies was "excess coverage over their primary limits." [Id., p. 9] "Typically that would be an auto, an MEL, it could be a P&I policy, a G&L policy, EL exposure, employer's liability exposure, and providing excess limits that these mid-size companies were required to have to work on or for offshore oil field companies." [Id., p. 9] Mr. Morency testified about one-third of the book of business at Liberty that he solicited and underwrote was for privately held mid-size offshore oilfield companies, such as Max Welders. [Id., pp. 9, 10] He testified that although such companies did not necessarily engage in the same type of work - *e.g.* some might do light fabrication work, some offshore installation work, others topside painting, light welding work, installation of

compressors, skids, and various other jobs associated with a platform - to an underwriter they all had very similar exposures. [Id., p. 10] Mr. Morency testified to his recollection, at no time during his career did any claim's department personnel ever ask him or anyone else in the underwriting department about the meaning of any exclusion in an insurance policy. [Id. pp. 18, 19]

Max Welders, also, has submitted the deposition testimony of John Kirchhofer, the underwriter for the 2002 Liberty Bumbershoot policy issued to Max Welders. [Doc. 362-15, p. 9, 63] Mr. Kirchhofer has been in the marine insurance industry since 1996. [Id., p. 4] While at Liberty, he wrote excess liability and blue water hull policies. [Id., p. 4] He wrote more than 200 bumbershoot policies each year while at Liberty. [Id., p. 4] Of those 200 plus policies a year, twenty-five to thirty percent of the insureds were offshore oilfield contractors. [Id., p. 8] He described a bumbershoot policy as "an umbrella type policy that cites excess of various underlying insurances and the form is designed for marine-related operations." [Id., p. 5] He testified the types of companies that would obtain bumbershoot policies were those having "marine type exposure for liability," such as marinas, boat dealerships, shipyards, marine contractors, oilfield-related contractors, and ship charters. [Id., p. 5] Mr. Kirchhofer described an "oil field-related contractor" as an entity who goes onboard offshore facilities to perform some type of service, such as repair work, consulting, catering, etc. [Id., p. 5] He testified "oilfield offshore contractor" is a common term in the bumbershoot excess market. [Id., p. 10] He testified a company involved in energy and exploration would not be classified as an oilfield contractor, but rather, would be classified by Liberty as E&P. [Id., pp. 5, 6] Mr. Kirchhofer testified when an offshore oilfield contractor submitted an application to Liberty for bumbershoot coverage, Liberty's primary interest was for whom the company worked, the type of work the company performed, its gross revenues,

loss history, and how long it had been in business. [Id., p. 8]

Mr. Kirchhofer testified Max Welders' application to Liberty described the nature of their business as: "Welding, fabrication and maintenance services for the oil and gas industries exploration companies, production companies. Insured also performed some slick line, wire lining operations." [Id., p. 12] He stated this means Max Welders is a third-party service provider to the oil and gas industry. [Id., p. 12] Mr. Kirchhofer noted the application disclosed Max Welders required coverage for crane operations, and testified the bumbershoot would provide coverage for crane operations. [Id., p. 14] He further noted the application discloses Max Welders works on platforms and platform-related equipment. [Id., p. 14] He further testified nothing was unusual about the nature of Max Welders' business, and it would fit the classes of risk Liberty was seeking to cover. [Id., pp. 12, 15] Mr. Kirchhofer testified based upon his review of the application and overview, all of the risks described therein would have been covered under the bumbershoot policy, and none would have required an endorsement modifying the bumbershoot. [Id., p. 15]

Mr. Kirchhofer testified his understanding is that exclusion 11(d) (*i.e.* the platform exclusion) is intended to exclude entities who have ownership of, or operate the various pieces of equipment listed in the exclusion. [Id., p. 19] He testified based upon the description of operations contained in Max Welders' application, the platform exclusion would not apply to Max Welders, because "Max Welders is a service provider for the offshore energy industry," which does not "own drilling rigs, drilling barges, drilling tenders, platforms as listed." [Id. at 19] Mr. Kirchhofer did not recall ever being contacted by Liberty's claims department regarding the platform exclusion while employed at Liberty. [Id., p. 21]

-23-

Max Welders, also, has submitted the deposition testimony of Blaine Vedros, Sr., owner of Millennium Insurance Group, who has been Max Welders' insurance agent since 1997. [Doc. 362-6, p. 8] Millennium Insurance Group is a property and casualty agency that exclusively services oil and gas marine companies, and companies that service the foregoing. Millennium strictly deals with "wet exposures." [Id., p. 3] Mr. Vedros has been "involved in the commercial oil and gas or marine business since 1990." [Id. at 4] He testified the types of insurance products he provides to oil and gas companies and their service contractors are general liability coverage (with or without endorsements, such as blanket waiver, blanket additional insured, in rem, Gulf of Mexico extensions, primary wording, severability of interest, etc.), workers' compensation (both state and longshore workers' compensation), maritime employer's liability, business or commercial auto policies, and, because "[a]ll of the oil companies require excess or extra insurance on top of those," he also provides either an umbrella or a bumbershoot policy.  When necessary, Mr. Vedros provides equipment floaters and various other specific property coverages. [Id., p. 4]

Mr. Vedros testified he provides basically the same type of coverage for all of the companies he insures, with the primary difference being that drilling contractors, owners and operators of wells require additional insurance that service contractors do not need, such as  endorsements and/or Operator's Extra Expense insurance ("O&E," a.k.a. "Control of Well Insurance"). [Id.]  As Mr. Vedros explained, drilling contractors, owners and operators of wells have "in-the-hole exposures," meaning those entities are "actually . . . putting pipe or drilling mechanisms inside the hole to either drill or work over the well in the hole itself." [Id.] Mr. Vedros utilizes a different insurance market (*i.e.* different insurers and/or brokers that have insurers) to insure entities with "in-the-hole exposure," than he does for contractors who service the foregoing. [Id., p. 4]

Mr. Vedros' testified a bumbershoot policy is a "specialized product," designed for the marine oil and gas business. [Id., p. 6] He continued, "It's not necessarily a follow form type of cover. But it's the excess above all the underlying coverages that you put on an oilfield contractor or possibly an oil and gas company, and owner-operator. You would put this excess layer on top of all of his covers." [Id., p. 6] Mr. Vedros testified prior to the creation of bumbershoots, excess P&I insurance was available, but it primarily covered only a crew on a vessel. [Id.] Mr. Vedros continued:

> [Bumbershoot] policies were formed later when you had oilfield contractors that were working in the gulf that had marine exposures as well as oil and gas or land or operations in the oilfield, [and] they had to find a way to put the policies together to cover all of the risk of these insurers and put them under an underlying. They couldn't call it an umbrella anymore because it really wasn't an umbrella, and yet it was. But it went over P&I exposures as well.

[Id., p. 6] Mr. Vedros testified between 2000 and 2004, the only insurance product available which would provide excess coverage for an oilfield service contractor over GL, auto, EL, MEL, and P&I insurance was a bumbershoot policy. The only other option was for the contractor to buy separate excess policies for each individual line of coverage. [Id., p. 7]

Mr. Vedros testified Max Welders is a fabrication yard, specializing in oil and gas equipment, piping, platforms, and "renovation of platforms where they weld, and they also fabricate new products to be placed on oil and gas structures." [Id.] Additionally, Max Welders sand blasts, paints, and does repair and maintenance work. [Id.] Their work is done either in the yard at Max Welders, or offshore on the platform itself. [Id., pp. 7, 8] Mr. Vedros testified that the term "oilfield offshore contractor" is a common term seen on bumbershoot policies, signifying the applicant works offshore ("which is anything over water, including inshore operations within the three-mile limit of state waters to the OCS, the shelf, and deepwater, and includes platforms, drilling rigs, semisubmersibles, jack-ups, etc."), and that the applicant is an "oilfield contractor," meaning they "contract[] to the oil

and gas industry, the oil companies themselves, the owners of the wells, the platforms, and the people that are actually producing the well." [Id. at 19]   From 2000 to 2004, Unocal was Max Welders primary account. [Id., p. 7] During that time frame, Max Welders had employees working on platforms approximately 200 to 300 days per year. [Id., p. 8]

Mr. Vedros testified when his office received the 2003-2004 bumbershoot policy for Max Welders, two of his employees, Ray Harley and Liz Roberson, would have gathered the policy, application and binding information, and then reviewed the policy, verified it contained all requested endorsements, verified all names and pricing were correct, and verified coverage was included for all of the insured's operations. [Id., pp. 19, 23-24]   When asked why, during that review,  the exclusion for "any liability or expense arising out of the ownership, use or operation of . . . platforms" did not raise any concerns for himself, Mr. Harley or Ms. Roberson, Mr. Vedros testified as follows:

> A.  The owner, the operator, or the oil companies, the reason for these platforms are for the oil company to produce oil or gas.  Max Welders isn't either one of those. *The use of the platform is to produce oil or gas.*  That's what it's for.  Max Welders is a contractor working for an oil company on their platform doing whatever service work that's required of them by that oil company, and they're strictly a contractor working for an oil company - -
>
> . . . .
>
> A.  - - as the policy itself states.

[Id. at 20 (emphasis added)]  Mr. Vedros testified exclusion 11(d) (*i.e.* the "platform exclusion") is a standard exclusion, contained in bumbershoot policies issued by other carriers as well as Liberty. [Id., p. 21] He further testified owners and operators of platforms would typically obtain a different type of policy than a bumbershoot, but if they did obtain solely a bumbershoot policy for excess coverage, exclusion 11(d) would have to removed in order to insure coverage for their operations.

-26-

[Id., p. 21] Mr. Vedros testified he has obtained bumbershoot policies for owners and operators in the past, but he had the platform exclusion removed from those policies. [Id., p. 21]

Max Welders, also, has submitted the deposition testimony of Anthony C. Schiavone, who has been employed by Liberty for nine and a half years. [Doc. 362-12, p. 3] Mr. Schiavone was hired as the Marine Claims Manager and was promoted to Vice President of Marine Claims for North America about two years later. [Id.] Prior to Liberty, Mr. Schiavone worked in marine claims at Fireman's Fund Insurance Company for 25 years. [Id. at 4] Mr. Schiavone handled bumbershoot claims both at Fireman's and at Liberty, but has never been involved in underwriting marine insurance. [Id. at 4, 5] Mr. Schiavone handled the Max Welder's claim for a short time beginning in 2007, and then transferred the claim to his co-worker, Christopher Frick. [Id., p. 15] Mr. Schiavone testified he is familiar with the Liberty's 2003-2004 Bumbershoot policies, but he has not seen the 2003-2004 policy issued to Max Welders. [Id. at 4]

Mr. Schiavone testified offshore oilfield contractors are a common type of business that would obtain bumbershoot coverage with Liberty. [Id. at 6] He stated his understanding is that such a contractor is "anyone who is brought on by a rig operator to perform a certain task." [Id., p. 6] He continued, "They can be brought on to actually handle the rig operation, platform operation. They can be brought on just to handle crane operations. They can be brought in just to do . . . roughneck operations, maybe some diving, underwater pipeline work, drilling, et cetera, fixing, maintaining, welding." [Id. at 6-7]

Mr. Schiavone testified the "Description of Insured Operations" (found at Item 7 of the Policy Declarations) "describ[e]s the insured's operations," which are "the operations that this policy will cover."  [Id. at 8] He continued, "Well, the way it reads now, 'Description of Insured

Operations' is we're covering the operations of the insured as an oil field offshore contractor." [Id.] Mr. Schiavone confirmed before the underwriting department binds a policy, the department obtains a description of the assured's work. [Id. at 9]

Mr. Schiavone testified in his opinion, exclusion 11(d) "would exclude just about any coverage, anything taking place arising out of the ownership operation of a drilling rig, et cetera, platform, any of these operations listed above." [Id. at 6] He further testified in his opinion, any company working on a platform that has a loss or exposure in connection with their work on the platform would not have coverage due to exclusion 11(d). [Id. at 7] Mr. Schiavone continued:

> Q. So if a company performs work on platforms and that's disclosed during the application process and the underwriter binds the policy, then the underwriter is binding the policy to insure those type of operations, aren't they?
>
> A. No, I disagree.
>
> Q. Why?
>
> A. Because policies are subject to terms and conditions with exclusions.
>
> . . . .
>
> Q. Didn't you tell me earlier that under your interpretation of the application and this exclusion that any company that's working on a platform or a drilling rig is going to have a claim arising out of that excluded under this policy?
>
> A. That's correct.
>
> Q. So, what is being insured for an offshore oil field contractor?
>
> A. I couldn't answer you that, I'm not the underwriter.
>
> Q. If the description of the insured operations is an offshore oil field contractor, and by your definition an offshore oil field contractor is a company that works on a rig or a platform, what coverage is being provided?

A.  I guess the best way for me to answer that is any operations that are carried out by the offshore operation that are not excluded under the policy, whatever they may be.

[Id. at 9] Thus, by Mr. Schiavone's own testimony, the policy is ambiguous in that: (1) "we're [*i.e.* Liberty] covering the operations of the insured as an oil field offshore contractor," but (2) by way of the platform exclusion, Liberty "would exclude just about any coverage, anything taking place arising out of the ownership operation of a . . . platform. . . ." [Id. at pp. 8, 6]  Mr. Schiavone disagreed that the exclusion for "ownership, use or operation of . . . platforms" was intended to apply to owners and operators of rigs with in-the-hole exposure. [Id. at 10]

Max Welders, also, submitted the deposition testimony of Christopher H. Frick, Senior Claims Specialist in Marine Claims at Liberty since February 2008. Prior to Liberty, Mr. Frick worked at a law firm as an attorney. [Doc. 362-14, p. 3] He has no prior experience working in a claims department at an insurance company, he has never been an underwriter, and he has never worked as an admiralty or marine litigator. [Id.] Mr. Frick is the current claims handler for the Max Welders claim. [Id. at 3]

Mr. Frick testified he denied coverage to Max Welders for this incident solely on the basis of the platform exclusion, stating "since the liability of Max Welders, Inc. arises out of the operation of that platform, there is no coverage for this claim." [Id. at 20, 21] Mr. Frick testified he made an independent evaluation and determined Max Welders was the operator of the platform by looking at the facts that were provided to him, specifically, that Mr. Ellerbee (Max Welders' crane operator) "[w]as operating a crane that was affixed to a portion of the platform when the incident occurred." [Id. at 21] Mr. Frick did not consult with anyone in underwriting regarding the definition of

"operation," nor did he consider "the type of business that Max Welders is engaged in." [Id.]

Regarding the scope of the platform exclusion, Mr. Frick testified as follows:

> Q. Can you tell me what type of business risk that Max Welders had that would be covered by this policy?
>
> A. Anything that falls within the terms of the policy.
>
> Q. Give me a specific example.
>
> A. Operations which are not excluded under the policy.
>
> . . . .
>
> Q. I think you told me that operating a crane that's affixed to a platform arises out of operation of that platform?
>
> A. Correct.
>
> Q. Now, Max Welders does maintenance work on platforms, okay.
>
> A. Okay.
>
> Q. So let's assume that they're involved in replacing a hand railing?
>
> A. Okay.
>
> Q. And let's further assume a claim arises out of that process. Would that be excluded under this policy?
>
> A. I would say it's likely that it would be.
>
> Q. Why?
>
> A. That would be use or operation of a platform.
>
> Q. Okay. Tell me what your understanding of operation of a platform is, what does that mean to you?
>
> A. Operation is anything to do with running the platform. What happens on the platform or around the platform, too.

Q.  So under that interpretation, any Bumbershoot policyholder working on a platform is not going to have any coverage for any liabilities arising out of that, isn't that right?

. . . .

A.  I mean I would have to see the specific facts of the claim. And I don't know that you can rule out every possible claim, but generally if it has to do with the use or operation of a platform, it's excluded, according to the language.

[Id. at 22] Mr. Frick testified he did not "have a particular understanding" of the term "offshore oil field contractor," and that it was not important to have a particular understanding. [Id. at 23] Mr. Frick's testimony concluded as follows:

Q.  Take a look at the declarations page.  What does item 7 say?

A.  "Description of insured operations: Oil field offshore contractor."

Q.  What does that mean to you, "Description of insured operations"?

A.  Describing what the insured does.

Q.  Does it say "insured's operation" or "insured operation"?

A.  "Insured operation."

Q.  Isn't that a description of what Liberty agreed to insure?

A.  I'm not the underwriter.  My interpretation of it is what is the insured's operation.

Q.  But would you defer to the underwriter?

A.  Correct.

. . . .

Q.  If the intent of the underwriter is to provide coverage for whatever "oil field offshore contractor" means, you don't think that affects how this exclusion gets applied?

A. I look at the policy and determine whether it is a covered claim under the policy issued.  Under this policy, it is not a covered claim.

. . . .

Q.  So if the underwriter, the broker and the insured have a different understanding from how this exclusion applies than you do, what happens?

A. I declined the claim.

Q. Without consulting with underwriting?

. . .

A. That's correct.

[Id. at 22-23]

Liberty, lastly, has submitted a portion of the testimony of Geoffrey Hughes, of Energy & Marine Underwriters.  Mr. Hughes brokered the Liberty bumbershoot policy on behalf of Max Welders, at the request of Mr. Vedros.  Mr. Hughes testified in his forty-plus years in the marine insurance industry, he has never seen the exclusion at issue applied to an oilfield service contractor, such as Max Welders.  [Doc. 381-3, p.4]

In this matter, the Court finds after full review of all argument and evidence presented, the parties' intent in entering into the 2003-2004 contract for bumbershoot insurance was to provide Max Welders with insurance coverage for liability arising out of the operations Max Welders conducted as an offshore oilfield contractor, which clearly included Max Welders' *activities* on platforms, as testified to by all underwriters and Max Welders' insurance agent.[18]  To apply the broadest definition of the terms "use" and "operation," as Liberty urges, would lead to an absurd result, in that, by Liberty's claims personnel's own admissions, *virtually no coverage would be*

_____

[18]In consideration thereof, Liberty received from Max Welders $52,250.00 in premiums for the 2003-2004 policy; Liberty received $48,000 in premiums for the 2002-2003 policy.

*available for Max Welder's declared and known work activities*.  Rather, the Court finds a narrower definition of the term "use" is in order which reflects the circumstances at hand.  As defined by *Black's Law Dictionary*, the term "use" means "[t]he application or employment of something; esp., a long-continued possession and employment of a thing for the purpose for which it is adapted, as distinguished from a possession and employment that is merely temporary or occasional." *Id.* (9th ed. 2009).  The term "use" is one of normal use and the definition noted is the common application and understanding of that term.  The Court finds after review of all evidence submitted, the foregoing definition is what the parties contemplated by "use" of a platform for purposes of the exclusion - *i.e.*, coverage would not be available where a party was *using* the platform for its intended purpose of extracting energy.  However, merely incidental support of the platform (*i.e.* to transfer a service contractor from the platform to a vessel) would not trigger application of the platform exclusion under its normal and customary definition, nor under the custom and practice of the specific industry.

As previously noted, under applicable Louisiana law, "a provision which seeks to narrow the insurer's obligation is strictly construed against the insurer, and, if the language of the exclusion is subject to two or more reasonable interpretations, the interpretation which favors coverage must be applied." *Elliot*, 949 at 1254.  Similarly, if the insurer "cannot unambiguously show an exclusion applies, the Policy must be construed in favor of coverage." *Martco*, 588 F.3d at 880.  In this matter, the preponderance of evidence establishes that according to "the customs and usage of the industry,"[19] the platform exclusion is designed to exclude coverage for "energy companies" (*i.e.* companies with "in-the-hole" exposure); it is not designed to exclude coverage for service contractors performing topside work *on* platforms.  Likewise, this Court's finding is further

---

[19]La. Civ. Code art. 2053; *Six Flags* at 955.

supported by "the reasonable expectations doctrine" which would dictate in favor of finding coverage, even if this Court were to have found Liberty's interpretation of the exclusion to be correct, which it does not. *La. Ins. Guar. Ass'n* at 764. In light of the foregoing, the Court finds Liberty has failed to carry its burden of proving the platform exclusion applies to this matter; consequently, this Court finds the exclusion does not apply and as Liberty has made no other allegations nor submitted any other argumental basis or evidence to defeat coverage other than the argued exclusion, this Court finds as the coverage issue was submitted to the Court upon briefs and evidence submitted, coverage is owed by Liberty to Max Welders.

The Court, also, finds the remaining claims of Max Welders against Liberty to have been waived, with the exception of Max Welders' claim asserted pursuant to the Louisiana Unfair Trade Practices Act and, perhaps, its claim of detrimental reliance[20], as the parties were ordered to address all "coverage and bad faith issues, as well as the remedies allowed" within this briefing. All matters found within the cross-claim of Max Welders against Liberty have been addressed, with the exception of the claims for detrimental reliance and for violation of the Louisiana Unfair Trade Practices Act. [*See* transcript of conference held May 26, 2010; *see also* Docs. 322, 354] However, this Court observes Max Welders concludes its brief with the following:

> Finally, Max Welders has asserted claims for breath [sic] of contract, bad faith breach of contract, violation of LA. R.S. 22:1973, and detrimental reliance. None of these claims are being determined by the Court upon the memoranda being

---

[20]Again, Max Welders' original cross-claim asserts Liberty: (1) waived any right to contest coverage and/or raise exclusions under a bumbershoot policy it issued to Max Welders; (2) violated duties owed to Max Welders pursuant to La. R.S. 22:1892 and La. R.S. 22:1973; (3) "breached its agreement to provide insurance to Max Welders, Inc. and breached its duties in bad faith"; and (4) violated the Louisiana Unfair Trade Practices Act. [Doc. 248, p.9] Max Welders' amended cross-claim added a claim of detrimental reliance, and additionally asked this Court to find no exclusions contained in the bumbershoot policy apply to this matter. [Doc. 251]

submitted by the parties and Max Welder [sic] will pursue those claims regardless of the result on the issues submitted herein.

[Doc. 362, p.38] Consequently, the parties are ordered to jointly contact this Court within five days to schedule a telephone status conference to fully address what, if any, claims or matters which require determination by this Court remain; Max Welders is to initiate that call.

THUS DONE AND SIGNED in Chambers, this ___25___ date of July, 2012.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE