U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

AUG 1 3 2013

TONY R. MOORE CLERK
BY _____
                    DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

MICHAEL CASH, ET AL.                        CIVIL ACTION NO. 04-1648

VERSUS                                      JUDGE DOHERTY

UNOCAL CORPORATION, ET AL.                  MAGISTRATE JUDGE HILL

## RULING

Currently pending before the Court are the following motions: (1) "Motion for New Trial/Reconsideration or, Alternatively, Motion to Certify Court's Ruling for Immediate Appeal," filed by Liberty Insurance Underwriters Inc. ("Liberty") [Doc. 411]; (2) "Motion for Leave to File Supplemental Trial Brief and for Reconsideration," filed by Max Welders, Inc. ("Max Welders") [Doc. 412]; and (3) "Motion for Post-Ruling Relief," filed by Max Welders [Doc. 413].

I.    **Motion for New Trial/Reconsideration or, Alternatively, Motion to Certify Court's Ruling for Immediate Appeal**

Liberty has filed a motion for new trial, pursuant to Fed. R. Civ. P. 59, or alternatively, a motion to certify this Court's Ruling [Doc. 398] for immediate appeal pursuant to 28 U.S.C. 1292(b). [Doc. 411] By way of its motion for new trial, Liberty requests that this Court reconsider its Ruling, which found coverage was owed by Liberty to Max Welders under the Liberty Excess Liability Policy for the events giving rise to this suit. [Doc. 411-1, p.1] Liberty argues reconsideration is warranted, because: (1) the Court's ruling employed "methodology . . . [in] violation of the rules of contract interpretation," in that the Court considered parol evidence in its analysis of the policy's coverage [Id. at 2]; (2) the Court's finding that Liberty had failed to support its position that the

1

particular crane at issue constituted a component part of the platform is clear error, because "Max Welders never disputed this fact" [Id. at 3]; and (3) the Court's finding that "'merely incidental support of the platform (i.e., to transfer a service contractor from the platform to a vessel) would not trigger application of the platform exclusion. . .' is contrary to settled law. [Id. at 4-5][1]

Max Welders opposes Liberty's motion for new trial, arguing the motion "does not meet the criteria for granting reconsideration or a new trial," as all arguments contained therein "were presented in Liberty's original trial brief," and "[m]ore importantly, Liberty does not offer any new evidence whatsoever in support of any of its arguments." [Doc. 417, p.2] In support of its argument, Max Welders cites to this Court's Ruling in *Johnson v. Hospital Corp. of America*, wherein this Court stated the following:

> Under established Fifth Circuit jurisprudence,

---

[1]For purposes of completeness, in its original Ruling, this Court held Liberty had failed to carry its burden to show the platform exclusion is applicable to this matter [Doc. 398, p. 34], finding: Liberty had not properly supported its argument that the crane was a component part of the platform, thus rendering the exclusion inapplicable [Id. at 13-17]; the contract is ambiguous, as none of its terms are defined and the pertinent terms are susceptible to more than one interpretation [Id. at 17-18]; there is a conflict between the declared coverage (*i.e.* to indemnify Max Welders with respect to its operations as an "Oilfield Offshore Contractor") and Liberty's broad interpretation of the platform exclusion [Id. at 18]; the word "use" is susceptible to more than one interpretation [Id. at 18] and must be interpreted using its narrower, more common definition, rather than its broadest possible application (as urged by Liberty), in order to best conform to the object of the contract and to render the contract effective [Id. at pp. 9, 32-33].

Additionally, one correction to this Court's original Ruling must be noted.  In its original Ruling, the Court incorrectly referred to the vessel upon which plaintiff was injured as a "drilling tender." [*See* Doc. 398, pp. 12, 13, and 14] The Court has again reviewed the entire record, and nowhere is the vessel referred to as a "drilling tender."  Rather, the particular vessel at issue is referred to in various documents as: a "field service vessel" [Doc. 32, pp. 2, 3; Doc. 105, p.4; Doc. 110, pp. 3, 4; Doc. 180, p.2], and as an "offshore supply vessel." [Doc. 37, p.3] The pertinence of that distinction is that the applicable exclusion in the Liberty Excess Liability Policy provides, in pertinent part: "This insurance does not apply to: . . . any liability or expense arising out of the ownership, use or operation of . . . *drilling tenders*, [and/or] platforms, . . . but this exclusion shall not apply to craft serving the foregoing such as crew, supply, or utility boats, *tenders*, barges or tugs." [Doc. 362-2, pp. 16, 18 (emphasis added)]

2

A Rule 59(e) motion "calls into question the correctness of a judgment." This Court has held that such a motion is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment. Rather, Rule 59(e) "serve[s] the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly.

*Templet v. HydroChem Inc.*, 367 F.3d 473, 478–79 (5th Cir.2004) (internal citations omitted) (emphasis added).

In *Lavespere*, this Court recognized while a district court has considerable discretion in deciding whether to reopen a case in response to a motion for reconsideration, such discretion is not limitless. 910 F.2d at 174. The Fifth Circuit has identified two important judicial imperatives relating to such a motion: 1) the need to bring litigation to an end; and 2) the need to render just decisions on the basis of all the facts, noting "[t]he task for the district court is to strike the proper balance between these competing interests. *Id.* The Fifth Circuit has further held "an unexcused failure to present evidence available at the time of summary judgment provides a valid basis for denying a subsequent motion for reconsideration." *See Templet v. HydroChem Inc.*, 367 F.3d at 478, *citing Russ v. Int'l Paper Co.*, 943 F.2d 589, 593 (5th Cir.1991).

*Johnson*, 2011 WL 1326853, *1 (W.D.La.)(emphasis omitted).

With the exception of Liberty's second argument (regarding the Court's finding that Liberty provided no basis for its position that the crane constituted a component part of the platform), the Court agrees with Max Welders that all arguments by Liberty were previously submitted to this Court in connection with Liberty's original briefing. Accordingly, those arguments will not be addressed herein, as a Rule 59 motion "is not the proper vehicle for rehashing evidence, legal theories, or arguments. . . ." *Templet* at 479. Although this Court acknowledges the question presented resulted in a "close call" by this Court, this Court nonetheless, made its determination subject to appeal to the appellate court, and a Rule 59 motion is not the proper procedural vehicle to re-argue that which has already been argued; a properly filed appeal to the appellate court is the

3

better vehicle.

With regard to Liberty's second argument, again, the Court finds Liberty has not carried its burden to show it is entitled to a new trial on this issue. Liberty has provided no legal support for its position that a new trial is warranted where a trial court, **in a matter tried to the bench**, declines to accept, on its face, an unchallenged, yet conclusory statement of mixed law and fact, made by counsel for a litigant, as opposed to a testifying witness.[2] Nevertheless, to the extent this Court may have erred on this narrow point, this Court notes a new trial would not lead to a different result. Even were this Court to find the crane is a component part of the platform, the outcome would be the same: the Court would still find the definition Liberty wishes to ascribe to the word "use" is overly broad, and that the parties, by way of their contract, contemplated the narrower, more "common application and understanding of that term," such that the policy exclusion would apply, removing coverage, "where a party was *using* the platform for its intended purpose of extracting energy," whereas "merely incidental support [or use] of the platform (*i.e.*, to transfer a service contractor from the platform to a vessel) would not trigger application of the platform exclusion under its normal and customary definition, nor under the custom and practice of the specific industry."[3] [Doc. 398, p.33 (emphasis in original)] In light of the foregoing, the Court finds Liberty

---

[2]*See e.g. Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 20 (1st Cir. 1999)("statements by counsel are not competent evidence" at trial)(citing *Fernandez v. Chardon*, 681 F.2d 42, 56, n.10 (1st Cir.1982) (statements by counsel are no substitute for admissible evidence)); *Jeon v. Holder*, 354 Fed.Appx. 50, 53 (5th Cir. 2009)(statements of counsel are not evidence); *Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1337 (5th Cir. 1980); *Fontenot v. McCall's Boat Rentals, Inc.*, 227 Fed.Appx. 397, 402 ("[T]he finder of fact is not necessarily obliged to accept a witness's testimony, even if some parts of it are not directly contradicted by other testimony in the record").

[3]As stated in the original Ruling:

To apply the broadest definition of the terms "use" and "operation," as Liberty urges, would lead to an absurd result, in that, by Liberty's claims personnel's own admissions,

has failed to carry its burden and show a new trial and/or reconsideration is warranted; their renewed argument being better suited to the appellant court.   Again, this Court acknowledges the issue presented generated a "close call" by this Court, however, it is the ruling of this Court, which, if in error, can be corrected by the appellate court.

In the alternative, Liberty moves that this matter be certified for immediate appeal pursuant to 28 U.S.C. 1292. [Id. at 5] 28 U.S.C. 1292(b) provides for interlocutory appeal when the district judge certifies that an order, which is not otherwise appealable, satisfies three criteria: (1) the order involves a controlling question of law; (2) there is substantial ground for difference of opinion as to that question; and (3) an immediate appeal from the order may materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b); *see also Clark–Dietz and Associates–Engineers, Inc. v. Basic Construction Co.*, 702 F.2d 67, 69 (5th Cir.1983).   An interlocutory appeal "does not lie simply to determine the correctness of a judgment of liability." *Clark-Dietz* at 68.   "The basic rule of appellate jurisdiction restricts review to final judgments, avoiding the delay and extra effort

---

> *virtually no coverage would be available for Max Welders' declared and known work activities*. Rather, the Court finds a narrower definition of the term "use" is in order which reflects the circumstances at hand. As defined by *Black's Law Dictionary*, the term "use" means "[t]he application or employment of something; esp., a long-continued possession and employment of a thing for the purpose for which it is adapted, as distinguished from a possession and employment that is merely temporary or occasional." *Id.* (9th ed. 2009). The term "use" is one of normal use and the definition noted is the common application and understanding of that term. The Court finds after review of all evidence submitted, the foregoing definition is what the parties contemplated by "use" of a platform for purposes of the exclusion - *i.e.*, coverage would not be available where a party was *using* the platform for its intended purpose of extracting energy. However, merely incidental support of the platform (*i.e.* to transfer a service contractor from the platform to a vessel) would not trigger application of the platform exclusion under its normal and customary definition, nor under the custom and practice of the specific industry.

[Doc. 398, pp. 32-33 (emphasis in original)]

of piecemeal appeals. Section 1292(b) appeals are exceptional." *Id.* at 69.  This matter has now been pending before this Court for more than four years, it has been pending in the Western District of Louisiana for almost nine years and it is close to completion.  As the delays necessitated by an interlocutory appeal would only serve to delay this matter further, the Court exercises its discretion to decline to certify this matter for immediate appeal as an immediate appeal will *not* materially advance the ultimate termination of the litigation, but rather would act to delay that ultimate termination at this late stage.

**II.     Motion for Leave to File Supplemental Trial Brief and for Reconsideration**

By way of this motion [Doc. 412], Max Welders: (1) seeks leave of Court to file a supplemental trial brief addressing its claims of bad faith, and (2) moves this Court to reconsider its prior Ruling, to the extent the Court did not address Max Welder's argument that Liberty had waived its right to contest coverage. [Doc. 412, p.1; 412-1, pp.1, 7; 412-6] With regard to Max Welders' motion for leave to file a supplemental trial brief addressing its claims of "bad faith," in this Court's original Ruling, after finding coverage was owed, the Court found the remaining claims asserted by Max Welders against Liberty, including claims of bad faith, had been waived, "as the parties were ordered to address all 'coverage and bad faith issues, as well as the remedies allowed' within th[eir] briefing."[4] [Doc. 398, p.34; *see also* Doc. 322 (ordering counsel to submit briefs addressing claims regarding "coverage and bad faith"), Doc. 348 (noting briefs "addressing coverage issues and allegations of bad faith" had not been received), and 354 (resetting missed deadline for counsel to submit trial briefs "regarding the coverage and bad faith issues")] By way of its motion for leave,

_____

[4]The Court notes Liberty <u>did</u> address Max Welders' bad faith claims in its trial brief. [Doc. 381, pp. 33-34]

Max Welders essentially argues it "overlooked" its duty to address bad faith, because it was "focused on the coverage issues," and because at the conferences discussing the trial briefs, the Court spent more time addressing coverage issues than bad faith claims. [Doc. 412-1, pp. 4-5]

Liberty opposes the motion for leave, arguing Max Welders has waived its claims of bad faith by failing to comply with this Court's three orders specifically instructing the parties to address claims of bad faith. Liberty additionally argues granting leave to Max Welders to file supplemental briefing would be costly, unfair and prejudicial to Liberty, and would "constitute a waste of time." [Doc. 415, pp. 1-2] This Court agrees with Liberty that Max Welders has waived its claims of bad faith. However, the Court need not make its determination regarding Max Welders' claims of bad faith solely on the basis of waiver.

Out of an abundance of caution, this Court has, again, reviewed briefs previously filed in the record, directed toward Max Welders' claims of bad faith. [*See e.g.* Doc. 214, pp. 6,7; Doc. 290] Like the motion now pending before the Court, these earlier filed briefs solely argue Liberty's denial of coverage was "arbitrary, capricious, or without probable cause," because Liberty incorrectly interpreted the platform exclusion contained in the bumbershoot policy.

In Max Welders' proposed supplemental brief (attached to its motion for leave), Max Welders argues:

> The Louisiana "bad faith statutes," LA R.S. 22:1892 and 22:1973, require insurers to act in "good faith and fair dealing," and impose an "affirmative duty to adjust claims fairly and properly. ..." In this case, the facts unequivocally establish that Liberty waited over 20 months to decline coverage for this claim, causing severe prejudice to Max Welders and resulting in Max Welders having to make a $400,000.00 settlement contribution to protect itself, among other costs.

[Doc. 412-3, p.2] Max Welders additionally argues Liberty breached its "duty of good faith and fair dealing," *see* La. R.S. 22:1973, by "misrepresenting pertinent facts or insurance policy provisions,"

*id.* at § (B)(1), in that Liberty interpreted the policy exclusion differently than did Max Welders.[5] [Id. at 5]

La. R.S. 22:1892 requires an insurer to pay the amount of any claim due an insured within 30 days after receipt of satisfactory proof of loss; it additionally provides that failure to do so, if arbitrary, capricious and without probable cause, subjects the insurer to a penalty, as well as attorney's fees and costs. La. R.S. 22:1892; *see also Reed v. State Farm Mut. Auto Ins. Co.*, 857 So.2d 1012 (La. 2003); *Daniels v. Imperial Fire and Cas. Ins. Co.*, 109 So.3d 32, 34 (La. App. 2 Cir. 2013). La. R.S. 22:1973 provides that an insurer owes its insured "a duty of good faith and fair dealing," and has "an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured." La. R.S. 22:1973(A). An insurer who breaches the foregoing duties "shall be liable for any damages sustained as a result of the breach." *Id.* "Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause," constitutes a breach of the insurer's duties, "if knowingly committed or performed by an insurer." *Id.* at (B).

The conduct prohibited by La. R.S. 22:1892 and La. R.S. 22:1973 is "virtually identical,"

---

[5]More specifically, Max Welders argues:

> With respect to the list of acts in 22:1973, (B)(1) is clearly at issue in this case, as Liberty misrepresented "pertinent facts for insurance policy provisions relating to any coverages at issue." The Cross-Claim asserted by Max Welders alleges the intent of exclusion 11(d) of Liberty's Bumbershoot Policy and the basis and intent on which it is to be applied. The Cross-Claim also alleges that Liberty has denied coverage for this claim, notwithstanding the meaning and intent of the exclusion, which is clearly a "misrepresentation" of the policy by Liberty to its insured, Max Welders, in violation of 22:1973(B)(1).

[Doc. 412-3, p.5]

with the primary difference being "the time periods allowed for payment."[6] *Reed* at 1020. Both statutes are penal in nature and must be strictly construed. *Id.* "The sanctions of penalties and attorney fees are not assessed unless a plaintiff's proof is clear that the insurer was in fact arbitrary, capricious, or without probable cause in refusing to pay."[7] *Reed* at 1021. "Penalties should be imposed only when the facts 'negate probable cause for nonpayment.'" *Louisiana Bag Co., Inc. v. Audubon Indem. Co.*, 999 So.2d 1104, 1114 (La. 2008)(quoting *Guillory v. Travelers Ins. Co.*, 294 So.2d 215, 217 (La. 1974)); *Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co.*, 706 F.3d 622, 635 (5th Cir. 2013). "The statutory penalties are inappropriate when the insurer has a reasonable basis to defend the claim and acts in good-faith reliance on that defense." *Louisiana Bag* at 1114; *Levy Gardens* at 635; *Reed* at 1021. When there are substantial, reasonable and legitimate questions as to the extent of an insurer's liability or an insured's loss, failure to pay within the statutory time period is not arbitrary, capricious, or without probable cause. *Louisiana Bag* at 1114-15.

Max Welders' sole argument arguably addressing the "arbitrary, capricious, or without probable cause" element of Max Welders' *prima facie* burden is that Liberty incorrectly interpreted the platform exclusion contained in the bumbershoot policy. [Doc. 412-3, p.5] The Court finds this

---

[6]Upon receipt of satisfactory proof of loss, La. R.S. 22:1892 requires payment within 30 days, whereas La. R.S. 22:1973(B)(5) requires payment within 60 days.

[7]"An 'arbitrary' act is an act "based on random choice or personal whim, rather than any reason or system." *Reed* at 1020, n.7 (citing The New Oxford American Dictionary 80 (Elizabeth J. Jewell & Frank Abate eds., 2001)). "'Capricious'" action is 'given to sudden and unaccountable changes of behavior.'" *Id.* The phrase, "arbitrary, capricious, or without probable cause," as used in La. R.S. 22:1892 and La. R.S. 22: 1973, "is synonymous with 'vexatious.'" *Reed* at 1021 (citing *Louisiana Maintenance Services, Inc. v. Certain Underwriters at Lloyd's of London*, 616 So.2d 1250, 1253 (La. 1993)). The Louisiana Supreme Court "has noted that 'vexatious refusal to pay' means unjustified, without reasonable or probable cause or excuse." *Id.* "Both phrases describe an insurer whose willful refusal of a claim is not based on a good-faith defense." *Id.*

argument does not constitute "proof [that] is clear that the insurer was in fact arbitrary, capricious, or without probable cause in refusing to pay." *Reed* at 1021. Moreover, the Court finds Liberty was not "arbitrary, capricious, or without probable cause" in refusing to pay, as its decision to deny coverage, although ultimately found to be incorrect by this Court, was made in good faith on question of contract interpretation which, even this Court has noted is "a close call." Liberty relied upon the only two cases within this circuit that either the Court or the parties have located addressing a similar policy exclusion - namely, *Underwriters at Lloyd's London v. OSCA*, Inc., 2006 WL 941794 (5th Cir. 2006) and *Janex Oil Co. Inc. V. Hanover Compressor*, 694 So.2d 415 (La. App. 4 Cir. 1997). While this Court ultimately found Liberty's interpretation of those cases to be overly broad, it does not find Liberty's interpretation of those cases was unreasonable.[8] *See e.g. Carney v. American Fire & Indem. Co.*, 371 So.2d 815, 819 (La. 1979)(Where trial judge, appellate court, and the courts of several sister states had all held that identical exclusion of insurance policy was not ambiguous, insurer's refusal to pay was not arbitrary, capricious or without probable cause and did not subject it to penalties); *Calogero v. Safeway Ins. Co. of Louisiana*, 753 So.2d 170, 173 (La. 2000)("where the insurer has legitimate doubts about coverage, the insurer has the right to litigate these questionable claims without being subjected to damages and penalties"); *Berk-Cohen*

---

[8]Both of the cases upon which Liberty relied involved virtually identical policy exclusions, excluding coverage for liability arising out of the "ownership, use or operation of . . . platforms." Doc. 362-2, p.18; *OSCA* at 22; *Janex* at 416. However, unlike this matter, the insureds in those cases were companies with "in-the-hole" exposure, who were "using" the platforms for their intended purposes of extracting energy at the time of the events giving rise to those suits. *See OSCA* at *1-*2 (insured sued for damages arising from an uncontrolled blowout, lasting several days, which occurred while insured was attempting to set a bridge plug in a well located on a platform); *Janex* at 416 (insured, who was hired "for supervision of all producing and *operational* activities related to the platform," was sued for damages arising out of a well fire and explosion, allegedly caused by the insured's negligent supervision of activities on the well) (emphasis in original). In this matter, as discussed in this Court's original Ruling, the events for which Max Welders seeks coverage involve only incidental "use" of a platform - *i.e.*, to transfer a service contractor from a platform to a vessel.

*Associates, L.L.C. v. Landmark American Ins. Co.*, 433 Fed.Appx. 268, *3 (5th Cir. 2011)(noting "our long line of precedent refusing to assess statutory penalties [pursuant to Louisiana law] where an insurer makes a good-faith error in interpreting its policy"). The Court finds, in this matter, a bona fide dispute existed between the litigants, and Liberty's refusal of Max Welders' claim was not made arbitrarily, but made reasonably and in good faith.  Although the Court disagrees with Liberty's interpretation of the policy exclusion, it finds Liberty's actions in this case should not subject it to the penalty provisions of La. R.S. 22:1892 and 1973.

To the extent Max Welders moves for reconsideration of its argument that Liberty waived its right to contest coverage, the motion is denied.  Because the Court found coverage was owed to Max Welders for this incident, the Court did not need to reach the issue of whether Liberty had waived its right to contest coverage, as that argument was then moot.  Max Welders has identified no "manifest errors of law or fact" warranting reconsideration. *Templet* at 478-79.  Accordingly, to the extent Max Welders seeks reconsideration of this Court's Ruling with regard to Liberty's alleged waiver of its right to contest coverage, the motion is denied.[9]

---

[9]Indeed, the only argument Max Welders makes in support of reconsideration of its waiver argument is as follows:

> Pursuant to the Court's Ruling, Max Welders is seeking post ruling relief and a Judgment that the Liberty policy provides coverage to Max Welders for its settlement contribution to Michael Cash's settlement, for Max Welders attorneys' fees and for interest.  It is anticipated that Liberty will oppose Max Welders requested relief and the Court's ruling on the waiver issue may help resolve Max Welders' potential relief pursuant to the Court's Ruling.

[Doc. 412-1, p.6] The above argument identifies no manifest error of law or fact, nor does it indicate Max Welders seeks to present newly discovered evidence; rather, it appears Max Welders merely seeks to rehash evidence, legal theories and arguments previously presented to the Court.

### III.   Motion for Post-Ruling Relief

By way of this motion [Doc. 413], Max Welders seeks an order from the Court that Max Welders "is entitled to reimbursement of it's [sic] settlement contribution of $400,000.00 that it made to Plaintiff, Michael Cash, interest on the $400,000.00 settlement contribution [pursuant to Louisiana state law] from date of payment, and attorneys' fees incurred by Max Welders in defending Michael Cash's claims." [Doc. 413-1, pp.1, 3] Liberty does not dispute Max Welders is entitled to reimbursement of its settlement contribution of $400,000.00, or that "reasonable interest is owed," but asserts, without any supporting authority, "that the federal interest rate should be applied." [Doc. 416, p.2] Liberty opposes Max Welders' request for attorney fees, arguing the bumbershoot policy precludes an award for defense costs.

For the reasons provided in *In re Matter of Complaint of Settoon Towing, L.L.C.,* --- F.3d ----, 2013 WL 3013868, *11-*13 (5th Cir.), the Court finds Liberty is liable for prejudgment interest, at the rate set by La. R.S. § 9:3500, from the date Max Welders paid $400,000.00 to fund its portion of the settlement with plaintiff.

With regard to attorneys' fees, Max Welders asserts it is entitled to recovery of attorneys' fees pursuant to the terms of the Liberty insurance policy.  Specifically, Max Welders relies upon the following provisions of the policy:

### I.   Insuring Agreement

#### A.   Coverage

> The Policy shall indemnify the Insured with respect to the operations listed in Item 7 of the Declarations for the following (including such expenses listed in the definition of "Ultimate Net Loss") . . . .

[Doc. 412-5, p. 83]

12

II.     **Definitions**

. . . .

**Q.**     **"Ultimate Net Loss"** shall mean the total damages for which insurance is provided under Section 1 ("Insuring Agreement")

[Id. at 86 (emphasis in original)]

II.     **Definitions**

. . . .

**H.**     **"Damages"** shall mean the following amounts for which the Insured becomes legally obligated to pay. . .:

. . . .

3     all sums paid as salaries, wages, compensation, fees, charges and *law costs*, premiums on attachment or appeal bonds, or interest expenses, for doctors, *lawyers*, nurses and investigators and other persons *and for litigation, settlement adjustment and investigation of claims and suits where same are paid as a consequence of any occurrence covered hereunder*, excluding, however the salaries of the Insured's employees and permanent general office overhead and also excluding any part of such expenses for which the Insured is covered by the terms of other insurance

[Id. at 84 (bold in original; italics added)] In light of the foregoing provisions, Max Welders asserts

Liberty must indemnify Max Welders for its "ultimate net loss," which includes "all sums paid as

. . . law costs. . . for . . . lawyers . . . and for litigation, settlement adjustment and investigation of

claims and suits. . . ." [Id.]

Max Welders cites to *Vesta Ins. Co. v. Amoco Production Co.*, 986 F.2d 981 (5th Cir. 1993)

in further support of its position.  In *Vesta*, the Fifth Circuit addressed a claim for attorneys' fees,

made pursuant to an insurance policy containing an almost identical definition of "ultimate net loss."

The *Vesta* court found, "The definition of the term 'ultimate net loss' in the Vesta insurance policy

13

*expressly and unambiguously includes* 'expenses for doctors, lawyers, nurses, and investigators and other persons and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder.'" *Id.* at 989 (emphasis added). Like the policy at issue in this matter, the policy addressed in *Vesta* contained no provision requiring the insurer to provide its insured with a defense, "[r]ather, all litigation costs and expenses are simply built into the determination of its 'ultimate net loss.'" *Id.*

       Max Welders concludes:

> By its own plain terms, the definition of damages includes attorneys' fees and litigation expenses. In this matter, Max Welders incurred attorneys' fees and litigation expenses to obtain the $400,000.00 settlement which this Honorable Court has ruled is covered under the policy. Accordingly, it is respectfully submitted that the attorneys' fees and expenses are included and are covered under the policy as part of Max Welders' *Ultimate Net Loss* arising from Michael Cash's occurrence. Accordingly, Max Welders respectfully requests this Honorable Court award attorneys' fees as a covered item under the Liberty policy and provide Max Welders an opportunity to submit proof of attorneys' fees and litigation expenses.

[Doc. 413-1, p.4 (emphasis in original)]

       Liberty opposes Max Welders' claim for attorneys' fees, first arguing "the very nature of the Liberty policy - an excess (bumbershoot) policy - precludes an award of defense costs." [Doc. 416, p.1] According to Liberty, "[d]efense is an obligation that remains with primary." [Id.] Liberty cites *Harville v. Twin City Fire Ins. Co.*, 885 F.2d 276, 278-79 (5th Cir. 1989) to support its position. Presumably, Liberty is relying on that portion of *Harville*, stating:

> Excess liability insurers contract to provide inexpensive insurance with high policy limits by requiring the insured to contract for primary insurance with another carrier. The premium is also held down by the fact that the duty to defend rests primarily on the primary insurer, falling on the excess liability carrier only when the primary carrier is not required to defend because the loss is not covered by the primary

policy.[10]

*Harville* at 278-79.  While Liberty appears to imply *Harville* provides a blanket, jurisprudential rule that an excess (bumbershoot) policy will never provide coverage for defense costs, there is nothing in *Harville* supporting such an argument.  To the extent Liberty intended to state the *duty to defend* "is an obligation that remains with primary," it would likely be correct.[11]  However, that is an issue distinct and separate from whether or not the Liberty policy indemnifies its insured for attorneys' fees.

Liberty continues, "Max Welders fails to recognize that the clear language of the policy prohibits an award of defense costs."  Liberty supports the foregoing argument by: (1) citing to the portion of the policy defining the scope of coverage, *supra*, which states, "The Policy shall *indemnify* the Insured with respect to . . . " [Doc. 412-5, p.83], and noting this provision "makes no mention of defense costs"; and (2) citing a portion of the "Assistance and Co-Operation" clause, which states, "The Company shall not be called upon to assume charge of the settlement or defense of any claim. . . ." [Doc. 416, p.1]

First, as previously noted, the fact that the policy does not impose upon Liberty a duty *to defend* its insured does not mean Liberty, by the terms of the policy, automatically has no duty *to reimburse its insured for attorneys' fees*.  Whether or not Liberty must *reimburse* its insured for

---

[10]Unlike the Liberty policy, the policy in *Harville* required the insurer to provide a defense "to which this policy applies and which no underlying insurer is obligated to defend. . . ." *Id.* at 278.  As discussed above, the Liberty policy mirrors the policy at issue in *Vesta*, where there was no provision requiring the insurer to provide its insured with a defense, "[r]ather, all litigation costs and expenses are simply built into the determination of its 'ultimate net loss.'"

[11]Liberty has not provided this Court with the insurance policy provided by the primary insurer, Lexington Insurance Company, and thus, this Court is unaware whether or not the Lexington policy contained a duty to defend provision.

15

attorneys' fees is determined by whether or not such fees are included under the policy's definition

of "Ultimate Net Loss."   With regard to Liberty's citation to the "Assistance and Co-Operation"

clause, the provision at issue reads in its entirety as follows:

> The Company shall not be called upon to assume charge of the settlement or defense
> of any claim made or suit brought or proceeding instituted against the Insured, but
> the Company shall have the right and shall be given the opportunity to associate with
> the Insured or the Insured's Underlying Insurers or both, in the defense and control
> of any claim, suit or proceeding relative to an occurrence where the claim or suit
> involves or appears reasonably likely to involve the Company, in which event the
> Insured, the Underlying Insurers and the Company shall co-operate in all things in the
> defense of such claim, suit or proceeding

[Doc. 412-5, p. 91] When the "Assistance and Co-Operation" clause is read in its entirety (coupled

with the jurisprudence addressing such provisions, *infra*), it is abundantly clear the provision is not

using the word "charge" in the manner Liberty attempts to define that word here - *i.e.*, as an

"expense" or "cost."   Rather, the foregoing provision uses the term "charge" to signify

"responsibility" or "management."[12]  The Court finds the "Assistance and Co-Operation" clause

recognizes that while Liberty does not have a duty to defend its insured, Liberty does have the right

to be involved in any litigation involving claims made against its insured.  *See e.g. Columbia*

*Casualty Company v. Georgia & Florida Railnet, Inc.*, 542 F.3d 106, 108 (5th Cir.

2008)(characterizing such a provision as follows: "although Columbia does not have a duty to defend

as that is generally understood, the policy does have a section entitled 'Duty to Defend' in which

Columbia has a right to be involved in limited ways in litigation"); *Institute of London Underwriters*

*v. First Horizon Inc. Co.*, 972 F.2d 125, 127, n.4 (such a provision provides the insurer with "the

option - the 'right and opportunity' - to associate in the defense of claims involving or likely to

---

[12]*See e.g.* BLACKS LAW DICTIONARY 265 (9th ed. 2009); *Charge Definition*, MERRIAM-
WEBSTER.COM, www.merriam-webster.com/dictionary/charge (Last visited August 7, 2013).

involve [the insurer]"); *Quinlan v. Liberty Bank and Trust Co.*, 575 So.2d 336, 343 (La. 1990)(provision disavows any obligation on the part of the insurer to provide a defense to a claim or suit, and, by separate provision defining "loss," treats defense costs as a component of the insured's loss which falls within the limits of coverage).

Finally, Liberty argues:

> In support of its argument, Max Welders relies on section II(H)(3), which states that the term "Damages" includes various different types of "salaries, wages, compensation, fees, charges and law costs" which "the Insured becomes legally obligated to pay." This provision is simply not applicable. There has been no judgment against Max Welders that gives rise to a legal obligation to pay such "salaries, wages, fees, etc." Further, Max Welders conveniently fails to quote the pertinent exclusion contained in that section. **Namely, the section excludes "any part of such expenses for which the Insured is covered by the terms of other insurance."** Thus, even if this section was somehow applicable, "law costs" would be excluded as such is clearly a responsibility of primary.

[Doc. 416, pp. 1-2 (emphasis in original; citation to record omitted)]

First, the Court observes Liberty has incorrectly quoted the referenced policy provision. The policy does not state damages include costs which "the Insured becomes legally obligated to pay." [Id. (emphasis in original)] Rather, the policy, as previously quoted by the Court, reads: "'**Damages**' shall mean . . . all sums paid as salaries, wages, compensation, fees, charges and law costs . . . where same are paid as a consequence of any occurrence covered hereunder. . . ." [Doc. 412-5, p. 84 (bold in original; underlining added)] Thus, by its own terms, the policy shall indemnify the insured for damages "paid as a consequence of any occurrence covered hereunder." [Id.] The policy does not solely indemnify the insured for damages the insured "becomes legally obligated to pay" by way of a *judgment*, as argued by Liberty. Furthermore, Liberty omits that portion of the definition of "damages" that states damages include "law costs, . . . for . . . lawyers . . . and for litigation, *settlement adjustment and investigation of claims and suits* where same are paid as a consequence

17

of any occurrence covered hereunder. . . ." In this matter, there was a "settlement adjustment" of a claim, and this Court previously found that claim constitutes an "occurrence" covered under the Liberty policy. [Doc. 398, p.34]

With regard to Liberty's argument that attorneys' fees are excluded, pursuant to the portion of the definition of damages "excluding any part of such expenses for which the Insured is covered by the terms of other insurance," the Court finds the exclusion merely states the obvious - Liberty's liability is excess to occurrences and expenses covered by other insurance carried by Max Welders. [*See also* Doc. 412-5, p. 83 ("the Company shall be liable for Ultimate Net Loss each occurrence excess of the Underlying Limits")] When the exclusion cited by Liberty is quoted in context, it provides that damages include "all sums paid as law costs, . . . for . . . lawyers . . . and for litigation, settlement adjustment and investigation of claims and suits where same are paid as a consequence of any occurrence covered hereunder, . . . excluding any part of such expenses for which the Insured is covered by the terms of other insurance." [Id. at 84] Again, in this matter there was a covered occurrence (*i.e.* the underlying claim of Michael Cash), which ultimately resulted in a $1,450,000 (one million four hundred fifty thousand dollars) settlement. Max Welders' primary insurer, Lexington Insurance Company, paid $1,000,000 (one million dollars) of the total settlement cost on behalf of Max Welders to settle the claim.[13] Max Welders paid $400,000 (four hundred thousand dollars) of the total settlement cost.[14] [Doc. 413-2, p.4] Once Max Welders' primary insurer paid $1,000,000 on behalf of Max Welders to settle Michael Cash's personal injury claim, the limits of

---

[13]According to Endorsement No. 1 of the Liberty bumbershoot policy, Lexington's limit of liability is $1,000,000 per occurrence. [Doc. 412-5, p.74]

[14]The remaining $50,000 of the total settlement was paid by other defendants in this matter. [Doc. 413-2, p.4]

the primary insurer's policy were exhausted, and thus, Max Welders' attorneys' fees were no longer "covered by the terms of other insurance." *See e.g. Vesta* at 985, 988; *Gabarick v. Laurin Maritime (America), Inc.*, 649 F.3d 417, 421-22.

In light of the foregoing, the Court finds Max Welders is entitled to an award of attorneys' fees, pursuant to the terms of the Liberty bumbershoot policy. Within fourteen days of issuance of this Ruling, Max Welders is to file a motion to fix attorneys' fees, along with an affidavit setting forth: (1) the customary hourly rate of each attorney and paralegal involved; (2) a description of each task for which Max Welders seeks recovery, and an itemized list of the amount of time expended on each task; (3) a statement of the total attorneys' fees sought, including an itemization as to how those fees were calculated (*i.e.* number of hours billed per attorney or paralegal multiplied by the customary rate); and (4) an itemized list of all costs and expenses for which Max Welders seeks recovery, including a statement of the total costs and expenses sought.

## Conclusion

In light of the foregoing, Liberty's "Motion for New Trial/Reconsideration or, Alternatively, Motion to Certify Court's Ruling for Immediate Appeal" [Doc. 411] is DENIED; Max Welders' "Motion for Leave to File Supplemental Trial Brief and for Reconsideration" [Doc. 412] is DENIED; and Max Welders' "Motion for Post-Ruling Relief" [Doc. 413] is GRANTED.

THUS DONE AND SIGNED in Chambers, Lafayette, Louisiana, this 13th day of August, 2013.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE